UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
DR. GERALD FINKEL, as Chairman of
the Joint Industry Board of the Electrical
Industry,

                          Plaintiff,

           - v -

FIREQUENCH, INC.,

                        Defendant.
----------------------------------------------------------x

**MEMORANDUM AND ORDER**

CV 09-4310 (VVP)

       The defendant Firequench, Inc. has moved for partial summary judgment in this action brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461 (2012).  The action was brought by the plaintiff Dr. Gerald Finkel, as Chairman of the Joint Industry Board of the Electrical Industry, to collect various sums due to the Joint Board in accordance with the terms of a collective bargaining agreement ("CBA") entered into by the defendant.  On this motion, Firequench seeks a determination that it does not owe contributions on behalf of its employees during their "probationary period."  They assert that the plain language of the CBA, which they argue codifies past industry practice, does not require such contributions.  The central inquiry on the motion is whether the language of the CBA unambiguously supports the defendant's position.  The court concludes that it does not.

# I.    LEGAL STANDARDS

## A.  Summary Judgment

Summary judgment will be granted if no genuine issue of material fact remains to be decided and the undisputed facts warrant judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Inst. for Shipboard Educ. v. Cigna Worldwide Ins. Co.,* 22 F.3d 414, 418 (2d Cir. 1994).   If a reasonable jury could return a verdict in favor of the non-moving party, a material issue of fact remains in contention and the motion for summary judgment must be denied.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).  On the other hand, if the evidence in favor of the non-movant is "merely colorable" or so insufficient such that no rational trier of fact could find in its favor, summary judgment may be granted.  *Id.* at 249-50 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967)).  Any ambiguities and all inferences must be drawn in favor of the non-movant, and the court must view the evidence in the light most favorable to the non-movant.  *See Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006);  *Inst. for Shipboard Educ.*, 22 F.3d at 418; *Twin Labs, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990).  The court is charged not with weighing the evidence or even with determining the truth, but with ensuring that genuine issues of fact remain in dispute.  *See Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 218 (S.D.N.Y. 2007) (citing cases).

The burden of proving that no material issue of fact remains in dispute rests on the moving party.  *Celotex Corp.,* 477 U.S. at 322; *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  If the moving party meets that initial burden by making an

evidentiary showing suggesting that no material factual issues remain, the burden then shifts to the non-moving party to produce evidence raising a material question of fact. *See* Fed. R. Civ. P. 56(e); *Miner v. Clinton County, New York,* 541 F.3d 464, 471 (2d Cir. 2008); *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1998). Thus, to avoid summary judgment, the non-movant must set forth specific factual allegations. *Fahle v Braslow*, 913 F. Supp. 145, 148-49 (E.D.N.Y. 1996) (citing, *inter alia, Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir. 1990)), *aff'd*, 111 F.3d 123 (2d Cir. 1997). In this vein, conclusory, *ipse dixit* assertions are not sufficient to defeat summary judgment. *Western World Ins. Co.,* 922 F.2d at 121. "'The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient' to defeat summary judgment. Rather, 'there must be evidence on which the jury could *reasonably* find for the [non-movant].' Moreover, the opposing party must set forth 'concrete particulars' showing that a trial is needed." *Cousin v. White Castle System, Inc.*, No. 06-CV-6335, 2009 WL 1955555, at *4 (E.D.N.Y. July 6, 2009) (quoting *Anderson*, 477 U.S. at 252).

Although the non-movant need not produce evidence in a form that would be admissible at trial, it cannot rest on the pleadings, and must set forth specific facts in affidavits, depositions, answers to interrogatories, or admissions on file, which together demonstrate a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp.,* 477 U.S. at 324; *accord, e.g., Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004); *Grennan v. Nassau County*, No. 04-CV-2158, 2007 WL 952067, at *5 (E.D.N.Y. Mar. 29, 2007). That said, a non-movant who bears the burden of proof at trial is not required to submit

affidavits, but may oppose the motion on the basis of the pleadings, depositions, and admissions on file. *Celotex*, 477 U.S. at 324; *Patterson*, 375 F.3d at 219. Moreover, a "verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment." *Patterson*, 375 F.3d at 219 (citing *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001)). The materiality of the facts is determined by the substantive law governing the claims, and whether they "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.

### B.    Interpretation of the 2005-09 CBA

ERISA states that, "every employer who is obligated to make contributions to a multi-employer plan under the terms of the plan or under the terms of a collectively bargained agreement shall. . . . make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. Generally, "[a] party is bound by a contract it has signed," *Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 34 (2d Cir. 1997), "regardless of his or her failure to read and understand its terms," *Ecoline, Inc. v. Local Union No. 12,* 271 Fed. Appx. 70, 72 (2d Cir. 2008) (citing *Consolidated Edison Co. of N.Y., Inc. v. United States,* 221 F.3d 364, 371 (2d Cir. 2000)). When interpreting a collective bargaining agreement, "traditional rules of contract interpretation apply as long as they are consistent with federal labor policies." *Aeronautical Indus. Dist. Lodge 91 v. Untied Technologies Corp.,* 230 F.3d 569, 576 (2d Cir. 2000). When resolving contract disputes, the court first examines the language of the contract to determine the parties' intent. *Stroll v. Epstein,* 818 F.

Supp. 640, 643 (S.D.N.Y. 1993).  If the CBA sets forth the parties' intent clearly and without ambiguity, the courts should look no further.  *Sterling Drug Inc., v. Bayer AG,* 792 F. Supp. 1357, 1356-66 (S.D.N.Y. 1992).

The Second Circuit has held that if a contribution obligation in a collective bargaining agreement is ambiguous the court may permit an "exploration of extrinsic evidence concerning the parties' intent." *DeVito v. Hempstead China Shop, Inc.,* 38 F. 3d 651, 654 (2d Cir. 1994).  Whether a contract is ambiguous is a question of law.  *Haber v. St. Paul Guardian Ins. Co.,* 137 F.3d 691, 695 (2d Cir. 1998).  Unless the court gleans some ambiguity from looking at the face of the contract, it will not look beyond the contract's four corners.  *Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.,* 748 F.2d 760, 765 (2d Cir. 1984); *see also Rosenblatt v. Christie, Manson & Woods Ltd.,* 195 Fed. Appx. 11, 12 (2d Cir. 2006).  A contract provision is ambiguous " 'when it is reasonably susceptible to more than one reading.' " *Haber,* 137 F.3d at 695.  The court gives unambiguous contract terms their plain meaning.  *Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 139 (2d Cir. 2000); *see also Rosenblatt,* 195 Fed. Appx. at 12. Summary judgment is "clearly permissible when the language of the contract provision in question is unambiguous."  If the court concludes the contract is ambiguous, however, its interpretation and determination becomes a question of fact, and summary judgment is clearly inappropriate.  *Rogath v. Siebenmann,* 129 F.3d 261, 267 (2d Cir. 1997).  Finally, the Second Circuit has held that summary judgment is improper in a contract case where the "party opposing summary judgment propounds a reasonable conflicting interpretation of a material

5

disputed fact." *Schering Corp. v. Home Ins. Co.,* 712 F. 2d 4, 9-10 (2d Cir. 1983) (citing *New York State Energy Research and Dev. Auth. v. Nuclear Fuel Serv., Inc.,* 666 F.2d 787, 790 (2d Cir. 1981)).

## II.    ANALYSIS

The plaintiff initiated this action to compel an audit of Firequench and to recover any unpaid benefit fund contributions revealed by the audit for the period from July 10, 2005 through March 31, 2008.  The audit, now completed, has revealed that Firequench has not paid benefit contributions on behalf of its "probationary employees" as that term is used in the CBA.  Firequench maintains that, when properly interpreted, the applicable provisions of the CBA do not require contributions to be made on behalf of probationary employees. Rather, the defendant argues that under the plain language of the CBA benefit fund contributions are payable only after the 90-day probationary period expires.  Firequench asserts that it has been the practice in the industry for over 20 years not to make benefit fund contributions for probationary employees.

Understanding Firequench's argument requires an examination of the provisions of the CBA on which they rely.  Although the defendant in its moving papers cites to various CBAs, the only CBA that requires examination is the 2005-09 CBA that pertains to the audit period at issue.[1]  There is no dispute that Firequench's obligation to make benefit fund contributions on behalf of an employee commences with the employee's hire date:

---

[1]The agreement is found at Exhibit E of the defendant's motion [DE 40].  It is a multi-employer collective bargaining agreement between the New York Systems Suppliers Association and the International Brotherhood of Electrical Workers Local Union #3.  It is hereafter cited as "Agreement."

6

> The employer benefit contribution for a new Employee(s) may be held in escrow for 30 days, after which, it will be payable to the Joint Industry Board retroactive to the Employee(s) hire date.

Agreement, art. 11, sec. 10.  The CBA, however, does not specifically define the term "hire date."  As a consequence, Firequench argues that the provisions concerning probationary employees found elsewhere in the CBA should be interpreted to mean that an employee's hire date is not the day when the employee first commences work, as one might expect, but rather the day after the employee completes the applicable probationary period.

The specific provisions on which Firequench relies are found in Article 3B of the CBA:

> Section 1
>
> All regular full-time employees covered by this Agreement who are hired on or after the effective date thereof, shall be subject to a probationary period of ninety (90) calendar days commencing with the first day on which the probationary employee regularly performs work for the Employer.
>
> Section 2
>
> An employee employed for more than ninety (90) calendar days shall be considered a regular employee (unless mutually agreed under Section 1 or otherwise) thereafter and shall have his start date calculated from the date of hire following the successful completion of the probationary period.

Agreement, art. 3B.  The critical language in Article 3B, as far as Firequench is concerned, is the language at the end of section 2 dealing with the calculation of an employee's start date.  They argue that the phrase "date of hire following the successful completion of the probationary period" can only mean that an employee's date of hire occurs *after* the employee has successfully completed the probationary period.  Thus, they argue, it follows that since a probationary employee's date of hire occurs after the probationary period, the obligation to

make benefit fund contributions does not commence until after the probationary period.

Such an interpretation, according to Firequench, is consistent with past practice in their

industry.

There are a several problems with Firequench's interpretation of section 2.  First, it is

equally (if not more) plausible to interpret section 2 as a clarification that, once an employee

has completed his probationary period, the employee's start date is to be calculated from the

date the employee was hired, *not* the date when the employee completed the probationary

period.  Moreover, Firequench's interpretation of the phrase "date of hire" in section 2 of

article 3B is entirely inconsistent with section 1 of the article.  Section 1 defines the persons

who are subject to the 90-day probationary period as "all regular full-time employees hired on

or after the effective date" of the agreement.  Thus, in order to be a probationary employee,

one must be "hired," and their "date of hire" necessarily occurs *before* the probationary period,

not after.  These problems with the defendant's interpretation of the CBA dooms their

contention that the CBA unambiguously relieves them of any obligation to make

contributions on behalf of probationary employees, and thus defeat the defendant's motion.

*See Rogath,* 129 F.3d at 267.

There are other reasons why Firequench's argument fails.  Nothing in article 3B

addresses an employer's obligation to make contributions to the employee benefit plans,

which are administered by a separate entity, the Joint Industry Board.  Rather the subject of

article 3B is the nature of the employer-employee relationship during the probationary period,

providing the employer with the freedom to layoff, discipline or discharge probationary

employees, and prohibiting probationary employees from taking sick days and personal days off.  Agreement, art. 3B, secs. 3, 4.  Since article 3B does not address benefit fund contributions at all, there is little basis for believing that the language on which Firequench relies was intended to have any impact on its obligation to make such contributions.

On the other hand, the provisions of the CBA that do address benefit fund contributions provide a sound basis for concluding that contributions *are* required with respect to probationary employees.  The provisions that address benefit fund contributions are found in article 11 of the CBA, which identifies the various funds for which contributions are required, as well as the formulas for determining the amounts of the contributions.  The formulas for several of the funds require the employer to remit certain percentages of "standard gross wages" as the employer's contributions to those funds.  Agreement, art. 11, secs. 3-4 & 8.  The term "standard gross wages" is separately defined in article 11 of the CBA to encompass wages for "all hours worked" without limitation as to the types of employees who work those hours.  Agreement, art. 11, sec. 2.  Several other formulas are calculated differently, however, and apply only to specific categories of employees.  Agreement, art. 11, secs. 5-6.  Thus, where the drafters of the CBA intended to exclude categories of employees from the employer's contribution obligations, they made it clear that they wished to do so.  It is therefore an entirely reasonable interpretation of the CBA that, in the absence of language excluding probationary employees from the categories of employees whose wages fall under the term "standard gross wages," the wages of probationary employees are to be included in calculating contributions whose formulas rest on "standard gross wages."  This reasonable

9

interpretation of the CBA with respect to contributions on behalf of probationary employees provides another basis for denying the defendant's summary judgment motion. *See Schering Corp.,* 712 F. 2d at 9-10.

Firequench's argument that past industry practice supports their interpretation of the CBA must be rejected. Their evidence of such a practice is disputed in a declaration submitted on behalf of the plaintiff by the individual who monitors the benefit fund contributions made by other employers subject to the CBA. *See* Declaration of Kevin Duffy ("Duffy Decl.") ¶ 5. The declaration thus raises a material fact in dispute that defeats summary judgment. At the very least the plaintiff would be entitled to discovery to test the truth of the defendant's assertion. *See* Fed. R. Civ. P. 56(d).

Finally, the court must also reject the defendant's argument that, as the plaintiff is the drafter of the CBA, it must be interpreted against the plaintiff's interests. The plaintiff is not a party to the CBA, and there is no evidence whatsoever in the record that the plaintiff had any role in drafting any of its provisions, much less the provisions on which the defendant has relied.

## CONCLUSION

In accordance with the above considerations, the defendant's motion for partial summary judgment is denied.

SO ORDERED:

*Viktor V. Pohorelsky*

VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated:      Brooklyn, New York
            March 26, 2013

10